IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| DUSTY CHAPLINE,<br><br>   Plaintiff,<br><br>vs.<br><br>CITY OF DES MOINES, IOWA,<br><br>   Defendant. | Case No. _____<br><br><br>**PETITION**<br>**and**<br>**JURY DEMAND** |

**COMES NOW** the Plaintiff, Dusty Chapline, and for her cause of action states the following:

## INTRODUCTION

1.      This is an action under the Iowa Civil Rights Act ("ICRA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), challenging Defendant's discrimination, harassment, and retaliation against Plaintiff.

2.      Plaintiff Dusty Chapline is an Iowa resident.

3.      Defendant City of Des Moines, Iowa, is a municipal corporation located in Polk County, Iowa.

4.      The acts about which Plaintiff complains occurred in Polk County, Iowa.

## PROCEDURAL REQUIREMENTS

5.      On October 11, 2024, within 300 days of the acts of which she complains, Plaintiff filed charges of employment discrimination against Defendant with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission.

6.      On April 2, 2025, within 300 days of the acts of which she complains, Plaintiff filed charges of employment discrimination against Defendant with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission.

7. On September 29, 2025, less than 90 days prior to the filing of this Petition, the Iowa Civil Rights Commission issued a right to sue letter with respect to Plaintiff's charges.

8. On December 17, 2025, less than 90 days prior to the filing of this Petition, the Equal Employment Opportunity Commission issued a right to sue letter with respect to Plaintiff's charges.

## FACTUAL BACKGROUND

9. Sergeant Chapline is a woman and a mother.

10. In August 2012, Defendant hired Sergeant Chapline to work for the Des Moines Police Department as a Police Officer.

11. In September 2014, Defendant promoted Sergeant Chapline to Senior Police Officer.

12. In May 2022, Defendant again promoted Sergeant Chapline to the rank of Sergeant.

13. Over the course of her career, Sergeant Chapline has faced numerous instances where Defendant overlooked her for promotion and career advancement opportunities in favor of less experienced male colleagues.

14. Defendant consistently favored male employees over Sergeant Chapline, hindering her professional development and devaluing her contributions and qualifications.

15. Officers that reported to Sergeant Chapline routinely bypassed her authority by seeking guidance or time-off approvals from male sergeants or higher-ranking male leaders instead of going to Sergeant Chapline, ignoring that she was their assigned supervisor.

16. This practice undermined Sergeant Chapline's authority and sent the message that her leadership carried less weight than that of her male counterparts.

17. On February 20, 2023, Sergeant Chapline submitted a request to Captain Ryan Doty to attend the FBI LEEDA trilogy school, a leadership training program essential for career advancement within law enforcement.

18. Sergeant Chapline made her intentions clear to Captain Doty, emphasizing that she wanted to be considered for any schools or programs that would help her progress in her career.

19. Captain Doty denied Sergeant Chapline's request to attend the FBI LEEDA training.

20. Sergeant Chapline later learned that Captain Doty had encouraged male sergeants Adam Herman and Jason Hays to apply for the FBI LEEDA program on a day that Sergeant Chapline was not working.

21. Neither Herman nor Hays possessed additional experience that justified encouraging them to attend the training over Sergeant Chapline.

22. In February 2023, Defendant approved Sergeant Herman to attend the training in August.

23. In February 2023, shortly after denying Sergeant Chapline's request to attend the leadership training, Defendant transferred Sergeant Chapline from 1st Watch Patrol to 1st Watch Records.

24. Once she was transferred to 1st Watch Records, Lieutenant Aaron Nord learned that Sergeant Chapline had been denied the FBI LEEDA training and took steps to approve Sergeant Chapline for the first portion of the trilogy course.

25. Sergeant Chapline then attended the first portion of the training in August 2023 alongside male Sergeants Adam Herman, Jason Hays, and Todd Wilshusen.

26. Notably, Sergeant Chapline was only permitted to attend this training after a male supervisor, Lieutenant Nord, intervened on her behalf, highlighting the bias she encountered in initially being overlooked.

3

27. Sergeant Chapline helped organize the Iowa Hero Academy, a yearly opportunity for young women in Central Iowa to explore careers in policing and public safety.

28. Sergeant Chapline took on additional responsibilities in the Department through her role in organizing the Hero Academy.

29. Sergeant Chapline worked on the Hero Academy for years, starting three years before she was promoted to sergeant.

30. Sergeant Chapline carried the organizational load for the Hero Academy by herself for years.

31. Sergeant Chapline found the Hero Academy work exhausting while managing her family, business, master's degree, and shift work.

32. During the July 2023 Hero Academy, Lieutenant Tina Kalar and Officer Brooklyn Dante harassed Sergeant Chapline.

33. On July 26, 2023, Sergeant Chapline informed Captain Doty that she intended to file a formal complaint after the Hero Academy concluded.

34. The 2023 Hero Academy concluded on July 29, 2023.

35. In August 2023, Sergeant Chapline filed a formal harassment complaint against Lieutenant Kalar and Officer Dante.

36. Captain Doty and Major Ness helped Sergeant Chapline file her complaint. Sergeant Chapline experienced retaliation from within the Department after filing her complaint.

37. Around this time, Sergeant Chapline also submitted a request to attend the remaining two FBI LEEDA trilogy courses.

38. In January 2024, Lieutenant Kalar sent an email asking for volunteers for the 2024 Women's Conference planning committee.

4

39.     Sergeant Chapline previously served on the committee and responded to Lt. Kalar expressing her interest in volunteering to serve on the committee again.

40.     On January 29, Lieutenant Kalar told Sergeant Chapline that she would be placed on the waitlist.

41.     On February 1, Lieutenant Kalar added Captain Donahue to the committee while continuing to exclude Sergeant Chapline.

42.     Lieutenant Kalar also selected male officers for the planning committee who had no prior involvement with the Women's Conference, continuing to exclude Sergeant Chapline.

43.     This exclusion was particularly frustrating for Sergeant Chapline, as the conference was supposed to be focused on women empowering other women, and female officers should have been prioritized for involvement.

44.     Sergeant Chapline was never added to the planning committee.

45.     Meanwhile, Officer Jessica Bastian was on the 2024 Women's Conference planning committee, and Lieutenant Kalar and Officer Dante shut down any idea she brought forward because they knew she spoke on Sergeant Chapline's behalf in the complaint.

46.     In January 2024, Sergeant Chapline asked Captain Doty about the status of her August 2023 complaint.

47.     Captain Doty contacted Major Michael McTaggart (now Chief McTaggart) to ask why Sergeant Chapline had not received any update.  McTaggart told him, "It's not my job to tell [Sergeant Chapline] about that."

48.     Sergeant Chapline had dozens of witnesses to the harassment who had not been contacted by Defendant.

49.     Defendant's investigator did not interview all witnesses to the harassment before closing the investigation for "insufficient evidence."

50. Defendant made the decision not to interview witnesses outside of the Department, and some of Defendant's own officers were not interviewed.

51. Sergeant Chapline identified multiple issues with the investigation process when she reviewed the report.

52. Defendant refused to provide Sergeant Chapline with a copy of the investigation report, only allowing her to read it in person.

53. Defendant's only response to Sergeant Chapline's complaint was to remove Lieutenant Kalar and Officer Dante from assisting with the Hero Academy.

54. Lieutenant Kalar and Officer Dante faced no other discipline or accountability for harassing Sergeant Chapline during the Hero Academy.

55. On February 1, Sergeant Chapline met with Chief Wingert about her complaint and the investigation.

56. Former Chief Dana Wingert admitted that Defendant had not interviewed all the witnesses to Sergeant Chapline's harassment to avoid embarrassing the Department.

57. By March 2024, Sergeant Chapline still had not received a response to her request to attend the last two FBI LEEDA trilogy training courses.

58. On March 17, 2024, Sergeant Chapline resubmitted her requests to attend the training in August 2024.

59. On March 18, Captain Chad Steffen denied Sergeant Chapline's request.

60. On March 19, Major McTaggart concurred with Captain Steffen's denial of Sergeant Chapline's request.

61. Sergeant Wilshusen was approved to take the third and final FBI LEEDA training in August 2024.

62.     In the same time frame that Sergeant Chapline was denied her request to attend the second FBI LEEDA course, male Sergeant Wilshusen was approved to complete all three parts of the trilogy by the same supervisors.

63.     The disparity in how Defendant treated Sergeant Chapline and her male counterparts was a consistent theme.

64.     By early 2024, Sergeant Chapline had several discussions with Captain Steffen regarding concerns about being undermined in her leadership role while on patrol.

65.     One such incident involved K9 Officer Cordell Miller, who refused to cooperate with Sergeant Chapline.

66.     Captain Steffen dismissed Sergeant Chapline's concerns, leaving her to deal with the fallout of being undermined by male officers.

67.     Additionally, when Sergeant Chapline inquired about the FBI LEEDA training, Captain Steffen delayed any further approvals, offering excuses about training schedules.

68.     Captain Steffen claimed that doing the trainings too close together was not productive and emphasized that Sergeant Chapline needed to be "present" at work.

69.     In contrast, male officers in the Department were consistently approved for similar training programs without issue or delay.

70.     On March 28, Sergeant Chapline met with Human Resources Business Partner Allison Lambert to report retaliation, gender discrimination, exclusion, and concerns about the investigation into her July 2023 sexual harassment complaint.

71.     Sergeant Chapline shared her concerns about being denied leadership training, excluded from being considered as a Watch Commander, and feeling sidelined in her career.

72.     Despite raising these serious issues, Defendant took no action to address the gender bias or retaliation Sergeant Chapline was experiencing.

7

73. Male officers continued to receive opportunities that Sergeant Chapline was denied, including several sergeants who had been recently promoted and were approved for the FBI LEEDA trilogy classes that Sergeant Chapline had been repeatedly denied.

74. On April 18, Sergeant Chapline followed up with Lambert regarding her concerns.

75. Lambert responded that she had just started to have conversations with Captain Rhamy about Sergeant Chapline's complaints.

76. It took Lambert three weeks to begin looking into Sergeant Chapline's complaints.

77. Sergeant Chapline tried to explain to Lambert that the work environment had become increasingly hostile and had taken a serious toll on her well-being.

78. Lambert offered no solutions and advised Sergeant Chapline to talk to Captain Steffen about her concerns.

79. On April 29, Lambert followed up with Sergeant Chapline and told her she understood her concerns about the sexual harassment complaint and investigation, but that she and Captain Rhamy had determined they did not need to talk to anyone further and the investigation was closed.

80. When Sergeant Chapline asked, Lambert confirmed that other witnesses to the harassment were not interviewed to avoid bringing embarrassment to the Department.

81. In May 2024, Sergeant Chapline reviewed Defendant's training schedule and found that male sergeants, including those promoted after her, were all approved for FBI LEEDA training during the same time period that her requests were denied.

82. These officers, some of whom had been sergeants for only a few months, were approved for leadership training and opportunities that Sergeant Chapline had sought and been denied multiple times.

83. These officers included Sergeants Gretchen Hays, Jason Hemsted, Peter Wilson, and Austin Finley.

84. Sergeant G. Hays was promoted to Sergeant a year after Sergeant Chapline.[1]

85. Sergeant Hemsted was promoted to Sergeant months after Sergeant Chapline.

86. As of May 2024, Sergeants Wilson and Finley had only been sergeants for approximately three months.

87. Male sergeants and sergeants promoted after Sergeant Chapline were approved for FBI LEEDA Trilogy courses in close succession while Sergeant Chapline's requests were denied four times.

88. Defendant justified its denials by claiming that Sergeant Chapline's requested courses were "too close in time," yet approved male sergeants for consecutive courses without similar restrictions or pushback.

89. To accommodate the number of male officers attending these trainings, Defendant even authorized overtime for other officers to cover their shifts, underscoring Defendant's willingness to expend resources to ensure male officers could attend, while arbitrarily denying Sergeant Chapline the same opportunities.

90. Defendant's consistent favoritism toward male officers, despite Sergeant Chapline's qualifications and experience, was emblematic of the broader gender discrimination she has faced throughout her tenure in the Department.

91. In mid-September 2024, Sergeant Chapline found out that her squad would be given to a new male sergeant and she would be moved into a rover position, removing her supervisory duties.

---

[1] Although Sergeant Gretchen Hays is female, she received favorable treatment due to her marriage to a male sergeant within the Department.

9

92.     Sergeant Chapline was hesitant to move into a rover position because rovers do not supervise officers and this would limit Sergeant Chapline's development as a leader.

93.     Leading a squad is critical for career advancement because it allowed Sergeant Chapline to supervise, apply discipline, and conduct evaluations, which are key responsibilities that helped build her resume.

94.     This was especially important because Lieutenant applications had just opened up, and the command staff knew Sergeant Chapline's goal was to become a Lieutenant.

95.     As a rover, Sergeant Chapline would not have the same responsibilities, effectively stripping her of the opportunity to gain leadership experience.

96.     Sergeant Chapline was upset but felt that she had no choice but to give up her squad, even though other sergeants had expressed interest in taking the rover role.

97.     Sergeant Grimes became the supervisor of Sergeant Chapline's squad.

98.     On September 17, Sergeant Chapline came into work to train Sergeant Grimes on how to build car sheets and fill him in on information regarding his new squad.

99.     Sergeant Chapline arrived to find Sergeant Herman had been assigned by Captain Steffen to be Sergeant Grimes' Field Training Officer ("FTO").

100.    Acting as an FTO typically comes with additional compensation.

101.    Defendant undermined Sergeant Chapline's authority by choosing someone who knew nothing about Sergeant Chapline's squad to train Sergeant Grimes.

102.    Defendant also consistently denied Sergeant Chapline the chance to serve as Watch Commander, a temporary leadership role assigned when supervisory officers are not on duty.

103.    The Watch Commander role is vital for demonstrating leadership and being denied that opportunity stifled Sergeant Chapline's career growth.

10

104. It became clear that Captain Steffen did not respect or regard Sergeant Chapline the same as her male peers.

105. On every shift, male officers bypassed Sergeant Chapline and went straight to male sergeants for guidance and direction, knowing that Sergeant Chapline would not be assigned Watch Commander.

106. By denying Sergeant Chapline both a squad and the Watch Commander role, Defendant actively held her back, making it more difficult for her to prove her leadership experience and advance her career.

107. On October 11, 2024, Sergeant Chapline filed a complaint with the Iowa Civil Rights Commission ("ICRC") against Defendant, alleging gender discrimination and retaliation.

108. Since filing her complaint, Sergeant Chapline has experienced additional and escalating retaliation from within the Department.

109. On November 3, 2024, Sergeant Chapline's colleagues were issued administrative interview notices, commonly referred to as "greenies."

110. Unlike typical greenies, these notices included an additional page explicitly stating the Office of Professional Standards ("OPS") had received notice from the ICRC of a complaint alleging gender bias, failure to promote, and failure to train.

111. The inclusion of specific details about the complaint was unprecedented and made it immediately clear that Sergeant Chapline was the complainant, as she was the only female sergeant in her department on her shift.

112. Sergeant Chapline received a greenie at the same time as the other male sergeants.

113. When the lieutenant handed them out, he specifically asked Sergeant Chapline if she knew what it was about.  He did not ask the same question of the male sergeants.

114. At the time, Sergeant Chapline had no idea what the interview notice was about.

11

115. As everyone began reading the notice, the room fell silent, and the atmosphere immediately became tense and awkward.

116. The disclosure of the details of Sergeant Chapline's complaint to uninvolved coworkers was humiliating for Sergeant Chapline and left her feeling exposed, singled out, and targeted by Defendant.

117. Sergeant Chapline immediately emailed Human Resources Business Partner Allison Lambert to report the incident.

118. In her email to Lambert, Sergeant Chapline explained that the disclosure of details about her complaint seemed retaliatory, as greenies had never included that degree of detail before.

119. Lambert responded the next day, stating that the administrative interviews were cancelled due to a "miscommunication," and that Defendant would respond to Sergeant Chapline's complaint directly through the ICRC.

120. However, the damage had already been done. Defendant had broadcast Sergeant Chapline's complaint to her colleagues, othering her and placing a target on her back.

121. Officer Derek Huxford informed Sergeant Chapline that within an hour of the greenies being distributed, Officer Cordell Miller had walked into roll call and announced that Sergeant Chapline had filed a lawsuit against Captains Steffen and Doty.

122. Officer Miller was incorrect as Sergeant Chapline had only filed an ICRC complaint, not a lawsuit.

123. Sergeant Chapline had heard her male colleagues disparage other women that came forward with complaints against Defendant, questioning their claims and making fun of them.

124. Sergeant Chapline was upset that her complaint was suddenly front and center and being gossiped about.

12

125.     The series of events and actions that followed Sergeant Chapline's ICRC complaint seemed to ignore Defendant's policies regarding the investigation of sex discrimination complaints.

126.     On November 8, 2024, Sergeant Chapline again emailed Lambert that details about her complaint were being improperly circulated in the Department.

127.     On November 15, Lambert informed Sergeant Chapline that Defendant retained an outside investigator to investigate Sergeant Chapline's complaint.

128.     On November 21, Sergeant Chapline learned that Defendant had retained Attorney Rebecca Reif to investigate her complaint.

129.     Sergeant Chapline knew that Reif had recently defended Defendant in a different lawsuit involving sex discrimination and retaliation, calling into question her impartiality as a supposedly neutral investigator.

130.     On November 29, 2024, after returning from the Thanksgiving holiday, Sergeant Chapline discovered that Captain Steffen had sent her and other female officers information about training opportunities.

131.     The courses Captain Steffen shared were not supervisory or leadership oriented, but instead were basic officer trainings targeted at women.

132.     These offerings were not relevant to Sergeant Chapline's current rank or career goals.

133.     In sharing those training opportunities, it appeared to be a disingenuous effort to appear supportive, especially given that Captain Steffen had previously denied Sergeant Chapline's request to attend a legitimate leadership training program.

134.     Upon her return from the holiday, Sergeant Chapline was also met with a series of passive-aggressive emails from Sergeant Grimes, who had recently been assigned to take over Sergeant Chapline's former squad.

13

135. Before taking time off for Thanksgiving, Sergeant Chapline had prepared a detailed memo outlining policy violations she had observed during a pursuit involving Officer Tiller, which she had forwarded to Officer Grimes.

136. Sergeant Chapline also asked Sergeant Grimes to personally review the pursuit with Officer Tiller, as Officer Tiller was now under his supervision.

137. When Sergeant Chapline followed up on November 29, 2024 to ask whether that conversation had occurred, Sergeant Grimes responded by stating that he should not be responsible for handling the discipline and that he wanted to distance himself from the situation.

138. Sergeant Grimes copied Captain Steffen and Lieutenant Nydam on his response, which was something he had never done before in his communications with Sergeant Chapline.

139. Sergeant Chapline explained to Sergeant Grimes that she had already completed the memo and that she was simply trying to keep him in the loop out of professional courtesy.

140. Sergeant Grimes accused Sergeant Chapline of trying to shift her responsibilities onto him, and Sergeant Chapline ultimately told him she would handle it herself.

141. Around the same time, Sergeant Grimes began copying supervisors on other emails with Sergeant Chapline about trivial matters like vacation scheduling.

142. Normally, when sergeants email one another they do not include supervisors on those communications.

143. The shift in Sergeant Grimes' tone and approach toward Sergeant Chapline was abrupt and seemed to coincide with learning about Sergeant Chapline's civil rights complaint.

144. Captain Steffen assigned Sergeant Chapline as Watch Commander for the first time on New Year's Eve and New Year's Day, which were two of the busiest nights of the year.

145. Defendant provided Sergeant Chapline with no formal training or guidance before assigning her those shifts.

14

146. Given the lack of preparation and timing, it seemed as though Defendant was intentionally setting Sergeant Chapline up for failure.

147. Despite Defendant's efforts, Sergeant Chapline excelled as Watch Commander.

148. Notably, Sergeant Chapline has not been scheduled as Watch Commander since then despite her success when given the opportunity.

149. As of April 2, 2025, the Watch Commander assignments were scheduled out through July, and Sergeant Chapline had not been assigned another shift in that role.

150. Multiple male sergeants who had been assigned as Watch Commander had less seniority than Sergeant Chapline at the Department and as a sergeant.

151. Watch Commander shifts provide additional compensation for the sergeant assigned to the role.

152. On January 8, 2025, Sergeant Chapline discovered that Sergeant Herman, with Captain Steffen's approval, had inserted himself and Sergeant Wilshusen into the Watch Commander schedule through March 2025. Meanwhile, Defendant continued to exclude Sergeant Chapline from these assignments despite her repeated requests and prior successful performance in the role.

153. On January 19, 2025, Sergeant Chapline submitted a new request to attend the final course of the FBI LEEDA trilogy school.

154. Sergeant Chapline had previously requested to attend this training when it was offered at the Des Moines Police Academy for free.

155. Despite the opportunity being local and cost-free, Captain Steffen denied Sergeant Chapline's request while approving the training for another male sergeant.

156. At this time, Defendant also approved this training for several other male sergeants who worked under a different captain.

15

157. As a result, those sergeants were able to complete the trilogy ahead of Sergeant Chapline and gain a competitive edge for future promotional opportunities.

158. Because of the professional disadvantages this caused Sergeant Chapline, she asked Defendant to approve her attendance at the next available FBI LEEDA course, which was being offered in April in Arizona.

159. Sergeant Chapline went out of her way to research and identify the most cost-effective option and submitted a detailed memo outlining the rationale and importance of completing the training.

160. Captain Rhamy and Lieutenant Carrington initially approved Sergeant Chapline's request.

161. On January 23, 2025, Major Doty contacted Sergeant Chapline to discuss the cost of the training, noting that the travel expenses made it more expensive than some alternatives.

162. He proposed other offerings of the course within driving distance, but none of the alternatives he identified worked with Sergeant Chapline's schedule.

163. Sergeant Chapline reminded Major Doty that she had tried to complete that exact training a year earlier when it was being offered at the Des Moines Police Academy for free, but that opportunity had been denied by Captain Steffen.

164. Major Doty acknowledged Sergeant Chapline's concerns but explained that approving her request could set a precedent Defendant did not want to establish regarding training expenditures.

165. However, Defendant had previously approved trainings at comparable or greater costs for other male officers.

166. Major Doty said he was in a difficult position and that he would need to consult with Chief McTaggart before making a final decision.

16

167. On January 31, 2025, Major Doty denied Sergeant Chapline's request to attend the April FBI LEEDA training in Arizona.

168. He directed Sergeant Chapline to attend one of the sessions being held in Iowa in October or November instead.

169. That delay meant that Sergeant Chapline would either be nearing completion or already finished with her master's degree by the time she was able to complete the course, which put her at a disadvantage compared to her peers for career advancement opportunities.

170. Sergeant Chapline was able to make adjustments to her schedule and childcare arrangements so that she could attend one of the alternative sessions being offered in Illinois in May 2025.

171. Major Doty approved Sergeant Chapline's request to attend the course in Illinois in May, but by the time Sergeant Chapline received that approval, it was too late for the course to assist her in completing her master's degree.

172. As a result, Sergeant Chapline was forced to enroll in an additional course to stay on track to graduate in a reasonable timeframe, which cost her over $1,000 out of pocket.

173. To make matters worse, Sergeant Chapline was aware that another male sergeant, Sergeant Brian Foster, had already been approved in 2025 to attend two out of town training schools which required travel expenses and time off from regular duties, exceeding what she had requested.

174. Meanwhile, Sergeant Chapline had to fight for nearly two years just to receive approval for the final course in the one leadership training series she had consistently requested since she was promoted to sergeant.

175. On March 12, 2025, Sergeant Chapline received Defendant's summary of Reif's investigation.

17

176. The findings stated that the widespread disclosure of information related to Sergeant Chapline's complaint was the result of the "rumor mill" and not attributable to any action by Defendant.

177. Reif's conclusions ignored the fact that Defendant distributed the greenies that set that "rumor mill" in action.

178. Reif's report also concluded that Sergeant Grimes had legitimate reasons for copying supervisors on communications with Sergeant Chapline and that Captain Steffen had valid reasons for assigning Sergeant Chapline to Watch Commander on New Year's Eve. However, the report did not provide any explanation or specific reasons to support those conclusions.

179. It was clear from Reif's report that she entered the investigation with a pre-determined conclusion in mind.

180. Despite the investigator's conclusions, Defendant's pattern of retaliation against Sergeant Chapline, including exclusion from leadership opportunities, unequal treatment in training opportunities, and the improper disclosure of Sergeant Chapline's prior complaint, has continued to negatively impact her professional reputation and limit her career advancement.

181. Ryan Doty was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

182. Adam Herman was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

183. Jason Hays was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

184. Aaron Nord was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

185. Todd Wilshusen was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

186. Dana Wingert was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

187. Chad Steffen was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

188. Cordell Miller was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

189. Michael McTaggart was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

190. Allison Lambert was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of her employment and agency.

191. Gretchen Hays was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of her employment and agency.

192. Jason Hemsted was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

193. Peter Wilson was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

194. Austin Finley was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

195. Brian Foster was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

196. Cody Grimes was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

197. Rodell Nydam was an employee and agent of Defendant City of Des Moines, acting at all material times in the scope of his employment and agency.

## COUNT I
## VIOLATION OF THE IOWA CIVIL RIGHTS ACT
## SEX DISCRIMINATION and HARASSMENT

198. Plaintiff repleads paragraphs 1 through 197 as if fully set forth herein.

199. Defendant subjected Plaintiff to unwelcome harassment in violation of the ICRA.

200. The harassment was based on Plaintiff's sex.

201. The harassment was severe or pervasive.

202. Defendant knew or should have known about the harassment.

203. Defendant failed to take prompt and appropriate action reasonably calculated to end the harassment.

204. Defendant subjected Plaintiff to discrimination, including adverse actions that subjected Plaintiff to some harm in relation to her employment, in violation of the ICRA.

205. Plaintiff's sex was a motivating factor in Defendant's actions.

206. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, betrayal, stress, medical expenses, lost enjoyment of life, lost wages, and employment benefits.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable relief, for prejudgment and postjudgment interest, for attorney fees, including litigation expenses, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Iowa Civil Rights Act.

## COUNT II

20

## VIOLATION OF THE IOWA CIVIL RIGHTS ACT
## RETALIATION

207.	Plaintiff repleads paragraphs 1 through 206 as if fully set forth herein.

208.	Plaintiff complained to Defendant and to the Iowa Civil Rights Commission about discrimination and harassment and otherwise opposed practices made unlawful by the ICRA.

209.	Defendant retaliated against Plaintiff because of her complaints and opposition to discrimination and harassment.

210.	Plaintiff's protected activity was a motivating factor in Defendant's retaliation against her.

211.	As a result of Defendant's illegal acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable relief, for prejudgment and postjudgment interest, for attorney fees, including litigation expenses, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the ICRA.

## COUNT III
## VIOLATIONS OF TITLE VII
## SEX DISCRIMINATION and HARASSMENT

212.	Plaintiff repleads paragraphs 1 through 211 as if fully set forth herein.

213.	Defendant subjected Plaintiff to severe or pervasive unwelcome harassment in violation of Title VII.

214.	The harassment was based on Plaintiff's sex.

215.	Defendant knew or should have known about the harassment.

216.	Defendant failed to take prompt and appropriate action reasonably calculated to end the harassment.

21

217. Defendant subjected Plaintiff to discrimination, including adverse actions that subjected Plaintiff to some harm in relation to her employment, in violation of Title VII.

218. Plaintiff's sex was a motivating factor in Defendant's actions.

219. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, betrayal, stress, medical expenses, lost enjoyment of life, lost wages, and employment benefits.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable relief, for prejudgment and postjudgment interest, for attorney fees, including litigation expenses, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act of 1964.

## COUNT IV
## VIOLATION OF TITLE VII
## RETALIATION

220. Plaintiff repleads paragraphs 1 through 219 as if fully set forth herein.

221. Plaintiff engaged in protected activity by complaining to Defendant and to the Iowa Civil Rights Commission and Equal Employment Opportunity Commission about discrimination and harassment and otherwise opposing practices made unlawful by Title VII.

222. Defendant retaliated against Plaintiff because of her complaints and opposition to discrimination and harassment.

223. Plaintiff's protected activity was a motivating factor in Defendant's retaliation against her.

22

224.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, betrayal, stress, medical expenses, and lost enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount that will fully and fairly compensate her for her injuries and damages, for appropriate equitable relief, for prejudgment and postjudgment interest, for attorney fees, including litigation expenses, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act of 1964.

## JURY DEMAND

COMES NOW the Plaintiff and requests a trial by jury.

/s/   Amy Beck
FIEDLER LAW FIRM, P.L.C.
Amy Beck AT0013022
amy@employmentlawiowa.com
Ashley Griffin AT0015719
ashley@employmentlawiowa.com
8831 Windsor Parkway
Johnston, IA 50131
Telephone: (515) 254-1999
Fax: (515) 254-9923
ATTORNEYS FOR PLAINTIFF